### INTERNATIONAL TICKET SCALE CORPORATION v. INTERNATIONAL TICKET SCALE CORPORATION OF CHICAGO, ILL., et al.

#### No. 4610.

Circuit Court of Appeals, Seventh Circuit.
March 16, 1932.

Joseph M. Cohen and George L. Schein, both of Chicago, Ill., for appellant.

Meyer Abrams, Max Shulman, and Bernard Shulman, all of Chicago, Ill., for appellees.

Before ALSCHULER, EVANS, and SPARKS, Circuit Judges.

EVANS, Circuit Judge.

This appeal is from a decree dismissing appellees' complaint and denying the relief sought in the counterclaim, and also directing the discharge of the receiver appointed earlier in the litigation to take charge of the property of appellee, the International Ticket Scale Corporation of Chicago, which corporation will hereinafter be called the Chica-go company. The disputes, out of which the litigation arose, grew out of a contract, which opposing litigants made, whereby appellee Elenbogen "purchased or contracted to purchase * * * 4000 International Ticket Scales * * * of the following models and at the following prices: Model 'A' at $200 each and Model 'S' at $250 each, F. O. B. Jamaica, New York. Deliveries to be made as follows: 1300 scales the first year and not less than 675 scales per year hereafter until the entire amount is taken. Payment for these scales to be made either for cash or on the basis of twenty dollars down payment on each scale when shipped, the balance to be paid in equal quarter yearly payments in five years." Elenbogen assigned this contract to his coappellee. The controversy arose over appellant's alleged failure to deliver machines ordered and over the Chicago company's failure to pay for machines delivered.

The litigation began in the state court, but was transferred to the federal court. Appellees were complainants below. They sought damages because of appellant's failure to deliver the so-called S machines when ordered and because the model A machines, which appellant delivered, were not as represented. Appellant, through its counterclaim, sought to recover the purchase price of machines delivered and damages for breach of the contract and equitable relief to protect its claims. The court found that both parties had breached their contract and denied relief to both.

The written agreement subsequently executed, and called an exclusive franchise agreement, while specifying the number of scales sold and the price of each model, failed to state the number of either model sold. It likewise failed to specifically define the delivery dates. While the legal questions are numerous, they all arise from the parties' inability to agree on (a) the number of scales of each model sold and (b) the delivery date of model S scales.

There were other issues of fact and law which we view as afterthoughts of the parties or their counsel. They were presented to the District Court and are raised in this court. We will not, however, discuss them save to announce our adoption of the District Court's findings thereon. The District Court found that appellees had failed to establish their claim that appellant made fraudulent representations prior to the execution of the contracts and the delivery of the scales; that the scales delivered were, from a

mechanical point of view, satisfactory and in compliance with the representations made by appellant concerning the same; and that the parties executed the contract in New York, and the Illinois law concerning the contracts of foreign corporations was not applicable to it.

The disposition of these questions leaves for determination only the terms of the agreement respecting the number and date of delivery of the model S scales. This question turns in part upon the admissibility of certain evidence bearing thereon, in view of the provision of the agreement to the effect that it "embodies the whole agreement of the parties."

We are well satisfied from a reading of the evidence that it was not contemplated by the parties that model S scales could be, or were to be, presently delivered. At the time of the execution of the agreement, appellant was making no model S scales, but was engaged in the manufacture of model A scales. At the time the agreement was made, the model S scale was only in the wooden form in which it had been conceived by the artist, and the tools and the dies for its manufacture were being ordered; and some months would necessarily elapse before appellant could put upon the market any model S scales.

The action of the parties confirms this impression. It appears that, shortly after the sales agreement was made, the parties negotiated the exclusive territory franchise agreement in New York, which referred to the purchase and sale of 4,000 International Ticket Scales. This agreement granted exclusive territory rights to Elenbogen and made specific provision for keeping the scales in good repair and free from liens, and defined appellant's rights in case of Elenbogen's defaults in payments. Shortly before this agreement was executed, the Chicago company was organized, and thereafter the contract was assigned by Elenbogen to it. The Chicago company then sent its first order for 35 model A scales, together with notes and conditional sales agreements covering the same.

A question of Elenbogen's personal responsibility for the payment of the notes arose, and negotiations were then had which resulted in an agreement, whereby the assignment to the Chicago company was recognized, but Elenbogen was not relieved from personal liability.

The first installment of scales was then shipped. A few weeks later a second installment of 200 scales was shipped, followed immediately by notice from appellant that it was ready to make another shipment of 200 scales. The Chicago company complained of shipments in less than carload lots. However, it forwarded its notes and conditional sales agreements to cover 170 of the 200 scales of the third shipment. Shortly thereafter the Chicago company sought the return of the notes covering these 170 scales. Again Elenbogen sought to get released from the contract. Negotiations were then had with the result that the third shipment was accepted by the Chicago company, and the notes and conditional sales agreements covering this installment were dated August 1, 1929. At this time, $8,100 had been paid by the Chicago company as a first payment on the 405 scales delivered. A further sum of $7,590 had been paid on the installments due on these scales. An unpaid balance of $65,310 remained. All scales ordered and all scales shipped were model A scales.

On July 27th appellees gave a written order for 895 model S scales for immediate delivery. Appellant, on August 2d, replied:

"In answer to your letter of July 27th, in which you direct us to ship immediately 895 of our Model 'S' scales, we write to remind you that you are well acquainted with the fact that our obligation to make deliveries under the contract was and is subject to our manufacturing situation.

"When we entered into our contract with Mr. Elenbogen, it was fully understood that Model 'S' was not in production and would not be in production until some time in the Fall and maybe later. Because of that fact, only Model 'A' scales have been ordered up to the present time.

"Of course, you well know that we are not in a position to ship 895 Model 'S' scales at this time and we recognize no obligation to do so.

"However, we have noted that you desire 895 Model 'S' Scales and we shall fill your order when production permits. When we have a sufficient number manufactured to make a full carload, we shall advise you that you may at that time send us the conditional sales agreement, notes and down payment, required under our contract with Mr. Elenbogen."

The Chicago company replied on August 16th:

"You state incorrectly that it is your obligation to make deliveries under the contract subject to your manufacturing situation. That is not the fact; the contract be-

tween us speaks for itself. The order of July 27, 1929, requested prompt delivery of the 895 model 'S' scales. In view of the fact that you are unable to make delivery under your contract, you are now requested to advise the writer of the earliest possible date upon which shipment of any model 'S' scales can be made, and that you make delivery of the scales only if and when the writer makes response to your advice regarding the availability of the model 'S' scales."

■ Upon this record it is impossible for us to escape the conclusion that the order for 895 model S scales, given July 27th, was voluntarily withdrawn. There was no breach of contract on appellant's part in not filling it. No specific replacement of this order, or any part of it, was ever made by appellees.

■ Another unavoidable conclusion from all the evidence we draw is that the parties understood the model S production situation when they contracted, and they dealt accordingly. In other words, it was understood that appellees were not to obtain model S scales until appellant was able to produce them. The oral testimony, the written testimony, and the conduct of the parties settle the question.

Appellees' order of July 27th was not a good faith one. It was a false, a strategic move in an effort to get Elenbogen released from an $800,000 liability. From the date of the making of the first contract up to the time this order was given, Elenbogen had continuously striven to get relieved from such liability. At the very time the July 27th order was given, he was strenuously endeavoring to avoid a personal liability for the third shipment amounting to about $40,000. The placing of the unexpectedly large order involving a total cost price of approximately $225,000, for which Elenbogen was personally liable, was hardly consistent with his studied and continued effort to relieve himself of a personal liability of $40,000. The promptness with which the July 27th order was withdrawn, though accompanied by an assertion that the vendee had the right to demand immediate delivery of model S scales, is confirmatory in character. The effort to evade and avoid was more ingenious than worthy or upright.

■ It follows, therefore, that, unless the evidence received were inadmissible, there was no breach of the agreement to sell and deliver scales on appellant's part. No valid reason for excluding this evidence appears. It was properly received in evidence, because the written memorandum embodying the agreement of the parties was incomplete and ambiguous as to delivery dates and the number of the different models sold. Ingram-Day Lumber Co. v. Schultz (C. C. A.) 45 F. (2d) 359, 362, dealt with a very similar situation. There this court said:

"In this respect we hold the contract was ambiguous and uncertain, and that the trial court very properly received in evidence previous and contemporary transactions and facts in order to determine the intention of the parties as to the dates and amounts of shipments."

See also Jones, Commentaries on Evidence, vol. 3, § 1493.

■ Nor is the court embarrassed in reaching this conclusion by the provision in the agreement of March 11, to the effect that it "embodies the whole agreement of the parties." This written agreement of March 11 was not the purchase and sales agreement. It was an exclusive territory grant, and dealt with other subjects. The reference to the sale of the 4,000 machines was in the nature of a consideration recital. It did not purport to cover the terms of the sale, and made no mention of the date of delivery of, nor the kind of, scales the purchaser might order. In the absence of any provision to the contrary, it was doubtless the privilege of the purchaser to designate the model desired, but that right did not give to it the right to order model S machines before they were manufactured and ready for distribution.

Whether we place our conclusion that appellant did not breach its contract on the ground that appellees' order of July 27th was by it withdrawn, or that S scales could not be ordered until manufactured, is immaterial. Either reason is sufficient, and the conclusion that appellant did not breach its contract makes a reversal of the decree necessary.

On December 28th the Chicago company brought an action at law in the superior court of Cook county to recover damages for the breach of the contract by appellant. Thereafter appellant elected to declare the full amount due upon all the installment contracts, because of appellees' failure to make the payments provided for therein.

■ Upon these facts, it necessarily follows that there was no breach of the contract on the part of the appellant, and it was therefore entitled to recover of appellees the balance due on the scales sold and delivered and also to recover damages, if its evidence disclosed any such damages as flowed from ap-

973

pellees' breach of their contract, which breach was evidenced by their bringing suit, their failure to pay for the machines delivered as the installments came due, and by their failure to order other machines.

At the hearing of the suit in the court below, a receiver was, upon motion of appellant, appointed to take possession and operate the 405 scales sold and delivered to appellees. This order was vacated by the final decree. Upon appellees' motion, appellant was enjoined from disposing of the notes which had been given in settlement of the scales delivered. Upon the hearing of the cause in the District Court, that court, it is needless to say, may reinstate any order or grant such other relief pendente lite as it, in its sound discretion, deems wise and just.

The decree is reversed, with directions to take further proceedings in accordance with the views herein expressed.